**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | |
|---|---|
| SHRYL ANN MARTIN,          ) | |
|           ) | |
|       Plaintiff,      ) | Civil Action No. 17-785 |
|           ) | |
|     v.        ) | Magistrate Judge Lisa Pupo Lenihan |
|           ) | |
| NANCY A. BERRYHILL,     ) | ECF Nos. 15 and 17 |
| *Acting Commissioner of Social Security*,   ) | |
|           ) | |
|      Defendant.    ) | |


## <u>MEMORANDUM OPINION</u>

### I. INTRODUCTION

Shryl Ann Martin ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 15; 16). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

### II. PROCEDURAL HISTORY

Plaintiff applied for DIB on August 27, 2013, claiming a disability onset of October 27, 2012. (R. at 82 – 89)[1]. Plaintiff claimed that her inability to work stemmed from a cartilage tear in the right wrist – requiring two surgeries. (R. at 82). Plaintiff is right-handed, and alleged that the range of motion limitations, loss of strength, and pain that continued even after her surgeries were serious impediments to ongoing employment. (R. at 212). Plaintiff was nonetheless denied

---

[1]     Citations to ECF. Nos. 13 – 13-20, the Record, *hereinafter*, "R. at __."

SSI on October 8, 2013. (R. at 93 – 96). Plaintiff challenged the initial determination, and a hearing was scheduled for May 13, 2015. (R. at 37 – 81). Plaintiff testified, represented by counsel, and a vocational expert was also present to testify. (*Id.*). The Administrative Law Judge ("ALJ") ultimately issued a decision denying benefits to Plaintiff on June 10, 2014. (R. at 17 – 33). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on April 20, 2017, making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 6).

Plaintiff filed a Complaint in this court on June 14, 2017. (ECF No. 1-1). Defendant filed an Answer on September 27, 2017. (ECF No. 12). Cross motions for summary judgment followed. The matter has been fully briefed. (ECF Nos. 16; 18).

## III. STATEMENT OF FACTS

### A. General Background

Plaintiff was born on December 31, 1965, and was forty-seven years of age at the time of her application for benefits. (R. at 159, 197). Plaintiff went no farther than the eleventh grade, but earned her GED in 2011. (R. at 210). She has no vocational or post-secondary education. (*Id.*). Plaintiff's last job as a cashier/stocker for a grocery store chain ended due to injury in October 2012. (*Id.*). She was previously employed as a corrections officer, hospital housekeeper, and high school security officer. (*Id.*). Plaintiff currently lives with her fiancé. (R. at 43). She reported no income at the time of her administrative hearing, but received limited medical benefits and was the recipient of a worker's compensation settlement in October 2014. (R. at 34, 45, 47, 131).

### B. Medical History

1. *Thomas Brockmeyer, M.D.*

On or about October 13, 2012, Plaintiff injured her right wrist at work. (R. at 250, 305). Following a series of imaging studies, Plaintiff was diagnosed with a right radial wrist sprain by orthopedic physician Thomas Brockmeyer, M.D. (R. at 298 – 99, 302, 305). Plaintiff described experiencing radiating, catching-type pain. (R. at 305). Upon inspection, Dr. Brockmeyer observed tenderness and a positive Shuck test. (R. at 306). Plaintiff was recommended for a course of physical therapy, and was determined unable to work. (R. at 306).

At a November 14, 2012, follow-up appointment, significant improvement in pain was reported. (R. at 301). Nonetheless, there was still a burning sensation which worsened with motion. (R. at 301). Plaintiff was provided with a brace and was to continue with therapy, but was not given a full release to work. (R. at 301).

At a December 5, 2012, examination, Dr. Brockmeyer determined that physical therapy was not having the desired effect; Plaintiff claimed that the activity was aggravating her wrist pain. (R. at 298). Tenderness was observed on inspection. (R. at 298). Plaintiff was referred to orthopedic specialist Marshall Balk, M.D., for further treatment and evaluation. (R. at 298). Plaintiff was still deemed unable to return to work. (R. at 298).

2. *Marshall Balk, M.D.*

Plaintiff was first seen by Dr. Balk on December 19, 2012. (R. at 339). Dr. Balk noted that Plaintiff complained of pain in three locations on her right wrist. (R. at 339). Upon examination, he observed diffuse tenderness. (R. at 340). An MRI scan of the wrist was ordered. (R. at 341). Dr. Balk  right wrist sprain but no fracture. (R. at 341).

Plaintiff's worker's compensation insurer denied the MRI. (R. at 336). Her pain continued to persist. (R. at 336). At a follow-up appointment, Dr. Balk again observed multiple

areas of tenderness on physical examination. (R. at 337). Accordingly, Dr. Balk recommended that Plaintiff undergo a diagnostic wrist arthroscopy, at which point any pathologies discovered could be addressed. (R. at 337). Plaintiff agreed with the recommended course of action, and the procedure was performed on February 7, 2013, during which Dr. Balk discovered a "very large unstable flap tear" of the triangular fibrocartilage complex. (R. at 334 – 35). The tear was addressed at that time. (R. at 335). At a post-operative evaluation on February 20, 2013, Plaintiff was found to be recovering well. (R. at 332).

By March 27, 2013, Plaintiff's wrist was noted to have a full range of motion, and her grip strength in the right hand was thirty-two pounds. (R. at 330). Nonetheless, Plaintiff complained of pain when cutting thick objects or carrying heavy items. (R. at 330). She did not feel that she benefited from the surgery as much as she had hoped. (R. at 330). Dr. Balk recommended engaging in physical therapy. (R. at 331).

Plaintiff saw Dr. Balk again on April 15, 2013. (R. at 327). She complained of minimal improvement of her pain, as well as clicking with forearm rotation. (R. at 327). Notes from Plaintiff's physical therapist reflected these complaints. (R. at 326). Dr. Balk observed, however, that Plaintiff's range of motion in the wrist was maintained and the strength in her right hand was at thirty-five pounds. (R. at 327). Nevertheless, Dr. Balk suggested that Plaintiff undergo an ulnar shortening osteotomy of the right wrist in an attempt to address Plaintiff's ongoing complaint. (R. at 328). He also explained that, even with the additional surgery, he could not guarantee improvement in Plaintiff's discomfort. (R. at 328). Plaintiff consented and the operation was performed on April 18, 2013. (R. at 323, 328).

On May 1, 2013, Plaintiff was observed to be recovering well from the procedure, and was ordered to go to therapy for her wrist. (R. at 321 – 322). By June 5, 2013, only mild

tenderness was observed by Dr. Balk. (R. at 319). On July 31, 2013, Dr. Balk reported that Plaintiff was making "slow steady progress," but acknowledged that Plaintiff experienced exquisite pain when making certain movements, such as turning doorknobs. (R. at 315). Despite this finding, Dr. Balk believed that Plaintiff could return to light duty work lifting no greater than five pounds, and prescribed additional therapy. (R. at 318, 343).

Plaintiff presented for an evaluation by Dr. Balk on October 11, 2013. (R. at 392). She complained of some general aching in her forearm. (R. at 392). In spite of Dr. Balk's prior recommendation, Plaintiff had not engaged in physical therapy for her wrist since her last appointment. (R. at 392). Physical examination revealed no crepitus and "fairly good" range of motion. (R. at 393). Some tenderness was observed, and strength in the right hand was forty-one pounds versus 70 pounds in the left. (R. at 393). Dr. Balk again recommended that Plaintiff engage in therapy. (R. at 393). In his notes, Dr. Balk indicated that Plaintiff's related worker's compensation claim was being settled and that he would like to get her back to full duty work. (R. at 393).

On February 12, 2014, Plaintiff returned to Dr. Balk due to issues with her left shoulder following a fall in August of 2013. (R. at 434). Plaintiff complained that pain and range of motion in her left shoulder had been progressively worsening since that time. (R. at 434). Examination of the shoulder demonstrated crepitus and limited range of motion. (R. at 435). Strength was normal. (R. at 435). Dr. Balk noted that a recent MRI showed evidence of adhesive capsulitis and a supraspinatus tear. (R. at 436). Consequently, he administered a cortisone injection to the left shoulder. (R. at 436).

Dr. Balk also examined Plaintiff's right wrist. (R. at 434). She had some generalized tenderness, but minimal pain with forearm rotation and mild discomfort with ulnar impaction

testing. (R. at 435). Dr. Balk believed that, while therapy and injections had not provided the pain relief initially anticipated, Plaintiff's wrist pain was slowly improving. (R. at 434). In addition to recommending continued therapy for Plaintiff's right wrist, Dr. Balk prescribed aggressive therapy for the left shoulder. (R. at 437). He did not feel surgery was appropriate at that time. (R. at 437). He did not release Plaintiff for work, noting that her worker's compensation case was not yet settled. (R. at 437).

By April 11, 2014, Plaintiff claimed to be experiencing persistent left shoulder stiffness, and informed Dr. Balk that the previous cortisone injection provided little benefit. (R. at 431). Her right wrist also continued to cause her some discomfort, and purportedly prevented her from lifting heavy objects. (R. at 431). Regardless, Plaintiff expressed that she was happy with the improvement she had experienced to that point. (R. at 431). Upon physical examination, Dr. Balk found mild tenderness in the wrist, but also observed good overall motion. (R. at 432). Right hand strength was forty-five pounds, versus fifty-four pounds for the left. (R. at 432). The left shoulder had limited motion in all directions, and palpation revealed mild tenderness. (R. at 432). Dr. Balk concluded that Plaintiff's wrist had attained maximum medical improvement and no further treatment was recommended. (R. at 433). He indicated that it would limit her to light duty work in the future. (R. at 433). Physical therapy for the left shoulder was to continue. (R. at 433).

Plaintiff's last record of treatment with Dr. Balk was on July 23, 2014. (R. at 428). At that time, it was noted that her left shoulder stiffness saw only slight improvement since her prior visit, and her pain had spread to the upper arm. (R. at 428). Upon inspection, Dr. Balk found Plaintiff to have full rotator cuff strength. (R. at 429). Dr. Balk again recommended ongoing physical therapy, and informed Plaintiff that improvement of adhesive capsulitis can take time.

(R. at 429).

### 3. *Joseph Prud'homme, M.D.*

On September 30, 2014, Plaintiff was examined by Joseph Prud'homme, M.D., for purposes of obtaining a second opinion on the condition of her right wrist and left shoulder; however, Plaintiff stated that – at that time – her primary concern was her left shoulder. (R. at 482). Dr. Prud'homme noted Plaintiff's history of adhesive capsulitis, as well as the surgeries to her wrist. (R. at 482). Upon physical examination, Dr. Prud'homme observed that Plaintiff was in no acute distress, that she had limited range of motion in her left shoulder, and some tenderness in the right wrist. (R. at 483). X-rays of the shoulder and wrist revealed no significant abnormality. (R. at 483). An MRI of the shoulder showed a rotator cuff tear. (R. at 483). Dr. Prud'homme recommended surgery for her shoulder issue. (R. at 483). He indicated that she should be off of work until her surgery. (R. at 483). He also remarked that because Plaintiff's former employer could not accommodate her light duty work restriction, her employment had recently been formally terminated. (R. at 482).

Dr. Prud'homme performed an arthroscopy of Plaintiff's right shoulder on October 9, 2014. (R. at 487 – 498). Dr. Prud'homme found no significant rotator cuff tear, but instead uncovered severe adhesive capsulitis, and did a debridement and capsular release. (R. at 491). Dr. Prud'homme concluded that Plaintiff would need to begin physical therapy as soon as possible after the surgery. (R. at 493). Plaintiff returned to Dr. Prud'homme for a post-surgical evaluation on October 22, 2014. (R. at 498). Plaintiff reported that she was pleased with the amount of motion in her shoulder and that her pain was only moderate. (R. at 499). She had already started physical therapy, and was also doing exercises at home. (R. at 499). Dr. Prud'homme explained that Plaintiff would need to engage in aggressive physical therapy to see

the full benefit of the surgery and avoid loss of motion. (R. at 499).

Plaintiff was evaluated again on November 19, 2014. (R. at 502). Plaintiff complained that she was not seeing a benefit from physical therapy and that the increasing aggressiveness of the exercises was causing her pain. (R. at 502). Dr. Prud'homme recorded that Plaintiff did not appear to be in acute distress. (R. at 502). Upon inspection, her range of motion had not improved since her last visit. (R. at 502). Dr. Prud'homme informed Plaintiff that it could take a year-and-a-half to two years for the adhesive capsulitis to fully resolve, and that she may not see significant improvements in her range of motion during that time. (R. at 502). He also stated that physical therapy often does not improve this outcome, and that Plaintiff may stop if she wished. (R. at 502). Plaintiff was told to return on an as-needed basis. (R. at 502).

Plaintiff returned to Dr. Prud'homme on February 4, 2015. (R. at 531). Her left shoulder was noted to have better range of motion than it had previously, and Plaintiff expressed that she was happy that she had the surgery on it. (R. at 531). Nonetheless, she was worried that her right shoulder was beginning to show signs of adhesive capsulitis. (R. at 531). Upon physical examination, Dr. Prud'homme concluded that Plaintiff had "great" range of motion in her right shoulder. (R. at 531). As a precaution, he recommended that she engage in some physical therapy. (R. at 531).

On March 18, 2015, Plaintiff complained to Dr. Prud'homme of stiffness in her left shoulder, as well as pain in the right shoulder. (R. at 535). Physical therapy had resulted in some improvement in the left shoulder, and Plaintiff again expressed that she was happy with her progress. (R. at 535). Physical inspection of the shoulders showed limited range of motion on the left, and near normal range of motion on the right, with some pain. (R. at 535). No significant pain was found in Plaintiff's right wrist. (R. at 535). Dr. Prud'homme prescribed

physical therapy to work on the range of motion in Plaintiff's shoulders, but did not believe any further intervention was required. (R. at 535 – 36). An NSAID was recommended for pain. (R. at 535).

    4. *Roshan Dhawale, M.D.*

On March 24, 2014, Plaintiff was seen by arthritis and rheumatic disease specialist Roshan Dhawale, M.D. (R. at 514). Plaintiff reported experiencing joint pain in her hand for the past five years, and similar pain in the knees for the past eight. (R. at 514). Prior x-rays of the hips, knees, and hands had shown some degenerative changes. (R. at 514). Plaintiff also recently had a positive antibody test which could be indicative of the presence of rheumatoid arthritis. (R. at 514). On a scale of 1 through 10, with 10 being worst, Plaintiff rated her pain as a 3 or a 4. (R. at 514). Upon examination, Plaintiff appeared to be healthy and was in no acute distress. (R. at 516). The lower extremities showed no signs of tenderness, pain, or swelling, with minimal crepitus in the knees. (R. at 516). Plaintiff's right wrist was tender, and her left shoulder had limited range of motion. (R. at 516). Plaintiff's spine had good range of motion and appeared normal, with the exception of some tender points. (R. at 516). Plaintiff had full strength. (R. at 516). Plaintiff was ordered to undergo additional diagnostic imaging and blood testing. (R. at 517). She was prescribed a trial of NSAIDs and Nexium. (R. at 517).

At a follow-up appointment on April 10, 2014, Dr. Dhawale found Plaintiff's physical condition to be largely unchanged. (R. at 520). Diagnostic imaging studies showed no signs of rheumatoid arthritis. (R. at 521). Plaintiff was prescribed a low-dose anti-inflammatory medication and Nexium for joint pain. (R. at 521). For tender points on the spine, Plaintiff was to try one-half to one tablet of Flexeril at bedtime. (R. at 521).

Plaintiff returned to Dr. Dhawale on January 20, 2015. (R. at 522). Physical examination

results were generally unchanged, except that Plaintiff had no tenderness in the wrists. (R. at 523). While her left shoulder still had limited range of motion, her right shoulder had good range of motion. (R. at 523). Plaintiff was prescribed Voltaren gel instead of NSAIDs, Elavil was added, and low-impact aerobic exercise was discussed. (R. at 524).

On March 31, 2015, Dr. Dhawale noted Plaintiff's complaints of increased pain in the ankles, knees, hips, shoulders, elbows, feet, and hands. (R. at 525). However, the results of Dr. Dhawale's physical examination were largely unchanged from the previous visits. (R. at 526). Only mild degenerative changes in the joints were revealed by diagnostic imaging studies. (R. at 527). Plaintiff's Elavil dosage was increased. (R. at 527). Dr. Dhawale noted that a pain specialist had prescribed Plaintiff a Fentanyl patch. (R. at 527).

5. *J. David Lynch, M.D.*

On December 16, 2014, Plaintiff appeared for an evaluation by orthopedic physician J. David Lynch, M.D., for chronic neck pain. (R. at 505). The pain purportedly started in 2007, and despite physical therapy and trigger point injections, had progressively worsened. (R. at 505). In addition to neck pain, Plaintiff complained of a pinching sensation, tingling in her hands, and weakness in her upper extremities. (R. at 505). Physical examination revealed Plaintiff to be in no acute distress with limited range of motion in the left shoulder, and somewhat less than full strength in the upper extremities. (R. at 505). Dr. Lynch concluded that Plaintiff had multilevel cervical disk disease, and noted a prior history of cervical stenosis. (R. at 506). Plaintiff was ordered to have x-rays and an MRI. (R. at 506).

Plaintiff was next evaluated by Dr. Lynch on February 24, 2015. (R. at 533). An MRI showed multilevel degenerative changes and some stenosis in the cervical spine. (R. at 533). Plaintiff complained of neck pain, shoulder pain, pain in both arms, and frozen shoulders. (R. at

533).  Following physical examination, Dr. Lynch found Plaintiff to have near full strength, but her left shoulder had limited range of motion.  (R. at 533).  Testing for neurological issues produced equivocal results.  (R. at 533).  Plaintiff was referred to Dr. Franz for further evaluation.  (R. at 533).

6. *Mark G. Franz, D.O.*

Records show that Plaintiff visited Mark G. Franz, D.O., on March 12, 2015 to address concerns about fibromyalgia and to obtain trigger point injections for treatment.  (R. at 550).  She reported to Dr. Franz that her pain varied day-to-day, and migrated between her joints.  (R. at 551).  Physical examination of Plaintiff's neck revealed tenderness, muscle spasm, and trigger points.  (R. at 551).  Dr. Franz observed similar findings over the thoracic spine.  (R. at 551).  Motor strength was found to be intact in Plaintiff's upper and lower extremities.  (R. at 552).  Plaintiff was advised to engage in physical therapy and, depending upon progress, trigger point injections would be considered.  (R. at 553).

On March 30, 2015, Plaintiff returned for an evaluation by Dr. Franz.  (R. at 542).  She continued to complain of joint pain and myalgia, stating that her pain was 6 on a scale of 1 through 10.  (R. at 542).  She did not believe that physical therapy was addressing her pain.  (R. at 542).  Plaintiff was ordered to continue with therapy and to take the pain medications prescribed by her other treating physicians.  (R. at 544).

The record shows that Plaintiff was last seen by Dr. Franz on April 16, 2015.  (R. at 537).  At that time, Plaintiff complained that her whole body was in pain, at a level of 8 on a scale of 1 to 10.  (R. at 537).  Plaintiff expressed an interest in receiving trigger point injections.  (R. at 537).  She also requested a Fentanyl patch refill.  (R. at 537).  Dr. Franz's findings upon physical examination of Plaintiff's neck and spine were largely unchanged.  (R. at 537).  It was noted that

physical therapy was beginning to have an appreciable effect on Plaintiff's pain, and she was ordered to continue. (R. at 540). Trigger point injections were ordered, as well. (R. at 540).

    C. <u>Functional Capacity Assessments</u>

    1. *Thomas Brockmeyer, M.D.*

In Medical Request Forms from CIGNA Group Insurance completed by Dr. Brockmeyer on December 12, 2012, and again on January 24, 2013, it was noted that Plaintiff was capable of "light work lifting" up to twenty pounds with frequent lifting of up to ten pounds. (R. at 307 – 08). Dr. Brockmeyer did not answer either form's query as to whether Plaintiff's condition precluded her return to work. (R. at 307 – 08). He stated only that she was sent to a hand specialist. (R. at 308).

    *2. Margel Guie, D.O.*

On October 4, 2013, state agency evaluator Margel Guie, D.O., completed a Residual Function Capacity ("RFC") assessment of Plaintiff. (R. at 86 – 87). Based upon Dr. Guie's review of the medical record, it was determined that Plaintiff could: occasionally lift or carry up to twenty pounds; frequently lift or carry up to ten pounds; stand or walk six hours of an eight-hour workday; sit six hours; and, push and pull without limitations. (R. at 86). Plaintiff would need to avoid moderate exposure to extreme cold, and concentrated exposure to noise and vibration. (R. at 87).

    3. *Jack Smith, M.D.*

On July 1, 2013, Jack Smith, M.D., examined Plaintiff for purposes of rendering an independent medical opinion. (R. at 609 – 13). His opinion first summarized the treatment history for Plaintiff's right wrist under Dr. Brockmeyer and Dr. Balk. (R. at 609 – 10). Plaintiff was noted to be under the care of Dr. Balk and, at the time of her evaluation, and was engaged in

physical therapy. (R. at 610 – 11). Inspection of Plaintiff's right wrist revealed diminished range of motion and some discomfort near the thumb. (R. at 610). Following a review of diagnostic imaging studies, Dr. Smith concluded that Plaintiff had wrist sprain with triangular fibrocartilage tear. (R. at 611). He also noted that Plaintiff's primary complaints included pain, weakness, and restricted range of motion. (R. at 611).

Based upon these findings, and his review of the medical record at that time, Dr. Smith felt that Plaintiff's right wrist required four to six months of recovery following her second surgery. (R. at 611). He had a "slightly guarded prognosis" of full resolution with the ability to eventually return to highly repetitive wrist activities with lifting of medium duty weights. (R. at 611). In the meantime, she would only be able to do modified work activities, as follows: sit, stand, or walk for eight hours; occasionally lift and carry up to ten pounds with the right arm and twenty pounds in the left; never climb ladders, crawl, or twist her wrist; frequently climb stairs, kneel/squat, twist her waist; bend, and reach; and, no simple grasping, pushing/pulling, or fine manipulation with the right hand. (R. at 612 – 13).

4. *Marshall Balk, M.D.*

On February 11, 2014, Dr. Balk completed a Medical Source Statement of Ability to do Work-related Activities (Physical). (R. at 529). Plaintiff's diagnosis was "pain in joint, hand," and "other wrist sprain + strain." (R. at 529). He reported that her complaints of wrist pain had gradually improved since surgery. (R. at 529). She was noted to be capable of sitting and/or standing for eight hours of an eight-hour work day. (R. at 529). He also indicated that Plaintiff could grasp, push, pull, manipulate, and finger with her left hand. (R. at 529). He did not state whether or not she could complete such tasks with her right hand. (R. at 529). "For now," Plaintiff was not able to carry or lift any amount of weight. (R. at 529). More specifically, she

was not to lift anything with her right wrist. (R. at 530). She could "reach in all directions" up to one-third of every work day. (R. at 530). While her impairments were believed to give her "good" days and "bad" days, Dr. Balk did not feel that Plaintiff would not be able to work eight hours on a "bad" day. (R. at 530). Neither would Plaintiff require unscheduled breaks during the day. (R. at 530). Dr. Balk noted that Plaintiff would not likely be absent from work due to pain or other symptoms related to her wrist. (R. at 530).

5. *Joseph Prud'homme, M.D.*

On April 13, 2015, Dr. Prud'homme authored a letter stating that Plaintiff was unable to work due to issues with both of her shoulders. (R. at 513). He noted that Plaintiff had adhesive capsulitis in her left shoulder for which she underwent surgery and engaged in physical therapy. (R. at 513). He noted that she had been making slow progress, but that signs of adhesive capsulitis were also developing in her right shoulder. (R. at 513). Although she was engaged in physical therapy for her right shoulder, surgery may be necessary in the future. (R. at 513).

6. *Mark G. Franz, D.O.*

On May 8, 2015, Dr. Franz completed at Medical Source Statement of Ability to do Work-related Activities (Physical) on Plaintiff's behalf. (R. at 614 – 15). He indicated that Plaintiff had been diagnosed with the following impairments: adhesive capsulitis of the left shoulder, status post-surgery; cervical foraminal stenosis; lumbar osteoarthritis; positive ANA; fibromyalgia; diabetes; and, hypothyroidism. (R. at 614). Dr. Franz indicated that Plaintiff had the following functional capacity during an eight-hour workday: sit for eight hours; stand/walk for one hour; grasp, push/pull, and manipulate/finger with both hands; lift five to 9 pounds up to one-third of the day; lift up to 4 pounds two-thirds or all of the day; never squat, crawl, or climb ladders/scaffolds; bend, climb stairs/ramps, and reach in all directions up to one-third of the day;

avoid unprotected heights; drive automotive equipment up to one-third of the day; and, tolerate exposure to dust, fumes, gases, and outdoor temperatures two-thirds or all of the day. (R. at 614 – 15). Dr. Franz concluded that Plaintiff was likely to experience up to fifteen "bad" days a month, during which she could not work eight hours. (R. at 615). He also found that her impairments would interfere with her ability to concentrate or focus between thirty-three and fifty percent of any given workday, that she would need up to four fifteen-minute unscheduled breaks per day, and that she would likely be absent from work more than four days per month. (R. at 615).

7. <u>Administrative Hearing</u>

Plaintiff testified that a number of physical impairments prohibited her from maintaining full-time work, including: fibromyalgia/myofascial pain disorder; weakness, loss of motion, and pain from adhesive capsulitis in both shoulders; weakness of the arms stemming from stenosis in the cervical spine; and, weakness, loss of motion, and pain in the right wrist. (R. at 55, 57 – 59, 64 – 65).

Plaintiff recounted that in October of 2012 she injured her right wrist, resulting in torn cartilage, severe pain, and loss of function. (R. at 57 – 58). On February 7, 2013, Plaintiff underwent surgery to repair the torn cartilage, but still experienced pain afterwards. (R. at 57). A follow-up procedure was conducted on April 18, 2013, and Plaintiff's treating physician, Dr. Balk, shortened Plaintiff's ulna, and implanted a plate and six screws in the right wrist. (R. at 58). Plaintiff claimed that the second surgery did not heal properly and she observed minimal improvement. (R. at 58). She claimed that Dr. Balk informed her that a five-pound weight limitation for the right wrist would be permanent. (R. at 58). He released Plaintiff for light duty work with said weight restriction in July 2013. (R. at 55, 58). Plaintiff explained that, following

the wrist surgery, her greatest limitations involved gripping items and any activity requiring her to apply pressure with her right hand and wrist; e.g., using a knife or writing for more than a few minutes. (R. at 58 – 59). Plaintiff also had difficulty carrying anything heavier than a two-liter bottle in her right hand. (R. at 59).

While recovering from her wrist surgery in July of 2013, Plaintiff fell and tore her rotator cuff in the left arm. (R. at 60). She explained that this was the genesis of her adhesive capsulitis. (R. at 60). Initially, Dr. Balk prescribed physical therapy for her pain; however, this proved ineffective. (R. at 61). Plaintiff described the shoulder pain from adhesive capsulitis as the worst she has ever experienced. (R. at 60). She lost her ability to reach with her arm, even to comb her hair. (R. at 62). In February of 2014, Plaintiff was referred to Dr. Prud'homme for further assessment and treatment of her shoulder. (R. at 61). In October of 2014, Prud'homme performed a surgical procedure on Plaintiff's left shoulder in an attempt to relieve her pain and address her limited range of motion, but to little effect. (R. at 56, 60 – 62). As a consequence, a surgery planned to treat the same condition developing in the right shoulder was postponed. (R. at 56). Dr. Prud'homme ordered physical therapy, instead. (R. at 56). Plaintiff has since experienced only minimal improvement in the right shoulder. (R. at 56).

Stenosis in the cervical spine has also purportedly affected fine motor functioning in Plaintiff's hands. (R. at 65). The condition has existed since a fall while working as a corrections officer, but progressively worsened over time. (R. at 65). Plaintiff claimed to also experienced pain in her neck and back, which she attributed to fibromyalgia as well as the stenosis. (R. at 64 – 65). Plaintiff saw Dr. Franz for these issues, and was provided with trigger point injections for pain. (R. at 64 – 65).

Finally, Plaintiff ascribed pain and fatigue in her upper and lower extremities and joints to myofascial pain. (R. at 66). This was characterized as a long-standing problem that was exacerbated by arthritis. (R. at 66). Plaintiff stated that she received trigger point injections for this pain, as well. (R. at 66 – 67). She also has a TENS unit for use at home. (R. at 71).

In terms of day-to-day activities, Plaintiff can drive, engages in limited grocery shopping, does light dusting around the house, gives her dogs food and water, and prepares frozen meals. (R. at 44, 63, 67, 70). However, she is only able to use a small "electric pushbroom" for cleaning. (R. at 63). As a general matter, she can lift up to ten pounds, but usually lifts no more than five. (R. at 63 – 64). Pushing and pulling are becoming increasingly difficult, and Plaintiff has difficulty reaching to clean herself after using the restroom. (R. at 64, 69). Plaintiff's pain medications – which include Fentanyl – make her drowsy. (R. at 67 – 68). As a result, Plaintiff claimed that "typical days are just kind of lounging around on the couch trying to rest." (R. at 67). She lays down six to eight times per day for a half-hour to an hour. (R. at 69, 71). Plaintiff rated her usual pain as 10 or more on a scale of 1 through 10, with 10 being the most severe. (R. at 68). Some days are better than others, but the pain is typically constant. (R. at 69). Thus, her fiancé helps her a great deal with daily tasks. (R. at 63).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational level, and work background would be eligible for a significant number of jobs in existence in the national economy if limited to sedentary work involving: no ladders, ropes, or scaffolds; occasional ramps and stairs; occasional balancing, stooping, crouching, and kneeling; no crawling; no concentrated exposure to hazards such as dangerous moving machinery or unprotected heights; no more than occasional handling with the right upper extremity; no more than frequent fingering with the right or left upper extremities; no

bilateral overhead reaching; no reaching behind one's self with the left upper extremity; no lifting of more than five to ten pounds with the right upper extremity; a sit/stand option; brief one to two-minute changes of position in intervals not to exceed thirty minutes; and, simple, routine, repetitive tasks.  (R. at 74 – 78)   The vocational expert responded that such a person would be capable of working in "surveillance system monitor" positions, with 79,000 such jobs available in the national economy, and in "callout operator" positions, with 53,700 such jobs available.  (R. at 77).  The ALJ asked the vocational expert whether this testimony conforms to the DOT.  (R. at 78).  The vocational expert responded by stating that the DOT does not address limitations such as reaching behind the back or overhead, or changing position.  (R. at 78).

## IV.   STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.  42 U.S.C. §423(d)(1)(A); *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014).  When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability.  20 C.F.R. § 404.1520.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work,

whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 – 06 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. § 405(g)[2]; *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

"Substantial evidence is defined as 'more than a mere scintilla;' it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 390 (1971). When considering a case, a district court cannot conduct a *de novo* review of

---

[2]        Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Trauterman v. Colvin*, 1 F.Supp.3d 432, 435 (W.D. Pa. 2014); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1191 (3d. Cir. 1986); *see also Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (where substantial evidence supports a decision, the court will not overturn it, even if in disagreement).

## V. DISCUSSION

In her decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairment in the way of: adhesive capsulitis of the bilateral shoulders, left greater than right; fibromyalgia; myofascial pain syndrome; restless leg syndrome; right wrist sprain and TFCC tear, status post arthroscopy and debridement and ulnar shortening osteotomy; degenerative disk disease of the cervical spine with stenosis; osteoarthritis of the bilateral knees; heel spur; plantar fibromatosis; hypertension; diabetes mellitus; GERD; hypothyroidism; and, obesity. (R. at 22). As a result of these impairments, the ALJ found that Plaintiff would be limited to sedentary work involving only occasional climbing of ramps or stairs; no climbing of ropes, ladders, or scaffolds; occasional balancing, stooping, crouching, and kneeling; no concentrated exposure to extreme cold, excessive noise, and vibration; no exposure to moving machinery or unprotected heights; no lifting of more than ten pounds with the right upper extremity; occasional handling

and frequent fingering with the right hand; no overhead lifting with either upper extremity; no reaching from behind with the left upper extremity; and, frequent handling and fingering with the left hand. (R. at 23). Plaintiff would need to be afforded brief opportunities to change position at intervals not to exceed thirty minutes. (R. at 23). Based upon the testimony of the vocational expert, the ALJ determined that Plaintiff was capable of engaging in a significant number of jobs in existence in the national economy. (R. at 24 – 29). Plaintiff was not, therefore, awarded SSI. (R. at 29).

Plaintiff objects to the decision of the ALJ, arguing that she erred in failing to base the Residual Functional Capacity ("RFC") assessment upon the appropriate factual basis; i.e., by failing to include all limitations stemming from the condition of her right wrist; failing to account for limitations resulting from fibromyalgia and cervical stenosis; and failing to adequately address the limitations presented by adhesive capsulitis. (ECF No. 16 at 10 – 12). Defendant counters that the ALJ's decision was properly supported by substantial evidence, and should be affirmed. (ECF No. 18 at 14 – 21). The Court agrees with Defendant.

Plaintiff begins by arguing that the ALJ's RFC assessment and hypothetical were inadequate because finding that Plaintiff could engage in "occasional handling" and "frequent fingering" with the right hand was contradicted by the medical record; specifically, the more severe limitations findings of Drs. Balk and Smith, and the effects of Plaintiff's fibromyalgia and cervical stenosis on her hands. (ECF No. 10 – 11). The Court first notes that, with respect to RFC assessments, ALJ's are not required to include every alleged limitation; their responsibility is to "accurately portray" only "credibly established limitations" which "are medically supported and otherwise uncontroverted in the record." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2003). Nonetheless, an "ALJ's finding of residual functional capacity must 'be accompanied by

a clear and satisfactory explication of the basis on which it rests.'" *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001) (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). "[T]he examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based." *Id.* (quoting *Baerga v. Richardson*, 500 F. 2d 309, 312 (3d Cir. 1974)).

In terms of the ALJ's "frequent fingering" limitation in the RFC assessment, Plaintiff argues that it "bears no clear relation to any of the medical opinion evidence," "cites nothing in the way of activities or medical observations," and fails to account for "other manipulative or handling limitations such as gripping or grasping." (ECF No. 16 at 11). However, the Court notes that Social Security Ruling 85-15 indicates that "'[f]ingering' involves picking, pinching, or otherwise working primarily with the fingers." "Handling" involves "seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands." *Id.* Thus, gripping and grasping are not addressed under "fingering," and Plaintiff adduces no objective medical evidence that the ALJ's determination pertaining to fingering was unsupported by substantial evidence. Accordingly, the Court finds no error. *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984) ("Under the Act, the burden of proof as to the medical basis of a finding of disability remains on the claimant at all times").

Yet, there is ample evidence that Plaintiff's ability to handle, including gripping and grasping, warranted a finding of some degree of limitation, and the ALJ clearly attempted to accommodate this limitation by including only "occasional handling" with the right hand in her RFC and hypothetical to the vocational expert. Plaintiff argues that this finding was insufficient to fully accommodate the limitations stemming from her right wrist. In her decision, the ALJ

discussed the functional capacity assessments rendered by Dr. Brockmeyer, Dr. Balk, Dr. Guie, Dr. Prud'homme, and Dr. Franz. In particular, she noted that Drs. Guie and Franz determined that Plaintiff had no limitation when it came to manipulation and handling. (R. at 26). She ultimately did not give these findings full weight, because Plaintiff's treatment records demonstrated that she had issues with pain, weakness, and limited range of motion in her right wrist, warranting some degree of accommodation. (R. at 26 – 28).

That said, the ALJ also declined to give full weight to Drs. Balk and Smith's conclusions that Plaintiff could not use her right hand to any significant degree. This was due, in part, to the inference that Dr. Balk was inflating Plaintiff's limitations in aid of her worker's compensation case; but, was also due to contradictory statements in Plaintiff's treatment notes. (R. at 25 – 26). Indeed, the ALJ noted that – at various points – Plaintiff was found to have a relatively good range of motion in her right wrist (R. at 327, 330, 393, 432), her pain, weakness, and limited range of motion made slow, steady progress (R. at 315, 434), and she was generally happy with her improvements (R. at 431). (R. at 25 – 26). The ALJ also remarked that Dr. Smith's limitations finding was not considered permanent, but that Plaintiff's prognosis – while slightly guarded – involved Plaintiff's eventual return to highly repetitive wrist activity. (R. at 26). Additionally, the Court notes that the only explicit limitation placed on Plaintiff's right wrist in Dr. Balk's medical source statement was that she could not lift weight with it. (R. at 529).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). Further, where there exist conflicting medical findings on the record under the ALJ's review, "the ALJ is not only entitled but required to choose

between them." *Cotter*, 642 F.2d at 705. Here, the medical record contained limitations findings ranging from minimal to extreme. Based upon the discussion contained in the ALJ's decision, it is clear that the ALJ's determination that Plaintiff experienced something in-between when concluding that she could engage in "occasional handling" with the right hand, was supported by substantial evidence.

Turning to Plaintiff's fibromyalgia and cervical stenosis, and the alleged effects of same on the ability to use her hands, the Court notes that the ALJ does address these conditions in her decision. (R. at 24, 27). The ALJ did not find Plaintiff's subjective complaints of limitation in her hands due to cervical stenosis to be credible. (R. at 24). To the extent that she found credible limitations stemming from these conditions, the ALJ attempted to accommodate same by confining Plaintiff to sedentary work. (R. at 27). Plaintiff argues that the ALJ should have discussed her subjective complaints of numbness and tingling, and the effects of these on her ability to handle and finger, in greater detail. (ECF No. 16 at 11).

However, "[a] written evaluation of every piece of evidence is not required, so long as the ALJ articulates at some minimum level her analysis of a particular line of evidence." *Phillips v. Barnhart*, 91 Fed. App'x 775, 780 n. 7 (3d Cir. 2004) (citing *Green v. Shalala*, 51 F. 3d 96, 101 (7th Cir. 1995)). "Moreover, the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it." *Id.* Plaintiff does not point to any objective medical evidence which indicated that her fibromyalgia or cervical stenosis resulted in greater limitation in handling or fingering than was provided in the ALJ's RFC assessment and hypothetical. To the extent that it appeared to be relevant, the ALJ accommodated Plaintiff's fibromyalgia and cervical stenosis-related issues with a sedentary work limitation. The Court finds no error, here.

Lastly, Plaintiff argues that the ALJ's RFC assessment and hypothetical failed to account for limitations in reaching beyond what was found by the ALJ; i.e., "no overhead lifting with either upper extremity," and no "reaching behind herself with the left upper extremity." (ECF No. 16 at 12). In her decision, the ALJ summarizes Plaintiff's subjective complaints of functional limitation resulting from her frozen shoulders. (R. at 24). Yet, the ALJ discussed treatment notes from Dr. Prud'homme that indicated that Plaintiff was pleased with her improving range of motion in the left shoulder. (R. at 26 – 27). Dr. Prud'homme also stated that Plaintiff had good improvement. (R. at 27).

As previously noted by the Court, the burden of establishing the existence of disabling limitations is on Plaintiff. *Early*, 743 F.2d at 1007. Plaintiff argues that treatment records show that Plaintiff could only achieve "half of the normal range of motion for abduction and flexion with her left shoulder," with "only 60 degrees abduction." (ECF No. 16 at 12). However, Plaintiff does not provide explicit limitations findings by treating sources pertaining to reaching which are not accommodated by the ALJ's provision of "no overhead reaching," and no "reaching behind" with the left arm. Moreover, Drs. Balk and Franz found in their functional capacity assessments that Plaintiff was capable of reaching in all directions, albeit with some temporal restrictions. (R. at 530, 614 – 15). As such, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's adhesive capsulitis, fibromyalgia, and cervical stenosis limit Plaintiff's ability to reach to the extent that she cannot perform jobs involving any overhead lifting or reaching behind with the left arm.

## VI. CONCLUSION

Based upon the foregoing, the ALJ engaged in sufficient discussion of the factual record to provide substantial evidence in support of her ultimate disability decision. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

*/s/ Lisa Pupo Lenihan*
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: January 17, 2017

cc/ecf: All counsel of record.